UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESUS RIVERA,

                              Plaintiff,

          - against -

JORGE MADAN, JARVIS JENKINS,
SHERRY CHEELEY, JAMES COYNE,
DENNIS KILCOYNE, ANDRE MCKOY,
MARGARET ROBERSON, AND
WINSTON PEART,

                              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 11, 2013

**MEMORANDUM**
**OPINION & ORDER**

10 Civ. 4136 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          This is a Section 1983 case in which Plaintiff Jesus Rivera claims that Defendants – New York State parole officers – subjected him to a body cavity search in violation of the Fourth Amendment.  He also alleges that the parole officers subjected him to excessive force after he requested medical attention.  Defendants have moved for summary judgment.  (Dkt. No. 49)  For the reasons set forth below, Defendants' motion will be GRANTED in part and DENIED in part.

**BACKGROUND**

          Plaintiff was sentenced to five years' imprisonment on October 1, 2003, following his conviction in Supreme Court of the State of New York, New York County, for Assault in the Second Degree.  (Def. R. 56.1. Stmt. ¶ 1) [1]  On April 11, 2008, Rivera began a five-year parole

---

[1]  To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

term under the supervision of Defendant Jorge Madan, a Parole Officer in the Bronx IV office of

New York State's Division of Parole ("Bronx IV").[2]  (Id.; Pltf. R. 56.1 App., Ex. 1 (Madan Dep.)

at 69)  Plaintiff's parole conditions included that he report to Bronx IV as required, submit to

substance abuse testing and counseling, and submit to searches by his parole officer.  (Def. R.

56.1 Stmt. ¶ 1)

## I.    RIVERA'S ARRIVAL AT BRONX IV

On January 29, 2009, Rivera failed to appear for a regularly scheduled report date

with Officer Madan at Bronx IV.  (Def. R. 56.1 Stmt. ¶ 3)  The next day, Officer Madan

contacted Rivera by telephone at the home of his then girlfriend.[3]  (Id.)  Officer Madan instructed

Rivera to report to Bronx IV that day.  (Id.; Pltf. R. 56.1 Stmt. ¶ 3)  After Rivera left for the

parole office, Officer Madan called Rivera's girlfriend's apartment again to ascertain whether

Rivera was on his way to Bronx IV.  (Madan Dep. at 83)  The girlfriend told Officer Madan that

Rivera left her apartment carrying small bags of crack cocaine.  (Def. R. 56.1 Stmt. ¶ 4; Pltf. R.

56.1 App., Ex. 5 (Confidential 17))  She also stated that Rivera had told her that if his parole was

revoked, he was either going to swallow the bags of drugs or insert them in his rectum in order to

smuggle them into Rikers Island.  (Id.)  She further reported to Officer Madan that Rivera was

planning on swallowing a razor or inserting it in his rectum.  (Def. R. 56.1 Stmt. ¶ 4; Madan

Dep. at 83)

Rivera arrived at Bronx IV at about noon on January 30, 2009.  (Pltf. R. 56.1

Stmt. ¶ 36)  Officer Madan did not immediately search or otherwise restrain Rivera.  (Id.)

---

[2]  In 2009, the Division of Parole was incorporated into the Department of Corrections and
Community Supervision ("DOCCS").

[3]  Because – as explained below – Rivera's girlfriend was an informant, Defendants have asked
that her identity not be disclosed in public filings pursuant to the law enforcement privilege.  See
Dkt. No. 57.

Instead, he told Plaintiff that he planned to administer a drug test.  (Def. R. 56.1 Stmt. ¶ 5)

Rivera told Officer Madan that the drug test would be positive, because he had used heroin the

day before.  (Id.; Pltf. R. 56.1 Stmt. ¶ 5)  Rivera nevertheless provided a urine sample.  (Madan

Dep. at 76)

Defendants claim that Rivera was immediately informed that he had violated his

parole conditions and was placed in handcuffs.  (Def. R. 56.1 Stmt. ¶ 6)  Rivera claims that after

he provided a urine sample, he was walked back to Officer Madan's office, unrestrained.  (Pltf.

Opp. Br. at 4-5 (citing Madan Dep. at 77-78))  According to Rivera, Officer Madan then filled

out some paperwork, left Rivera in the office with another parole officer, and went upstairs to

speak with his supervisor, Defendant Sherry Cheeley.  (Id.; Pltf. R. 56.1 Stmt. ¶ 6)  When

Officer Madan returned to his office, he made several telephone calls to in-patient drug treatment

centers to determine whether they had space for Rivera.  (Pltf. R. 56.1 Stmt. ¶ 6)

While Rivera was sitting in his office, Officer Madan observed Rivera

"squirming" in his seat.  (Def. R. 56.1 Stmt. ¶ 8)

Officer Madan told Rivera that he could be placed in a residential drug treatment

program or the Bellevue Men's Shelter – as an alternative to incarceration – if he agreed to have

no further contact with his girlfriend, whom Officer Madan believed had a bad influence on

Rivera.  (Def. R. 56.1 Stmt. ¶ 6; Pltf. R. 56.1 Stmt. ¶ 6)  Rivera told Officer Madan that he would

not break off contact with his girlfriend, and for that reason he preferred incarceration to

placement in a drug treatment program.  (Def. R. 56.1 Stmt. ¶ 7)  Rivera then became upset and

began "cursing everybody out" and arguing with Officers Madan and Cheeley, insisting that he

would continue to see his girlfriend no matter the consequences.  (Def. R. 56.1 Stmt. ¶ 11; Pltf.

R. 56.1 Stmt. ¶ 11; Pltf. Opp. Br. 5)  Rivera admits that he was acting "belligerent."  (Pltf. Opp.

Br. at 5 (citing Pltf. R. 56.1 App., Ex. 7 (Cheeley Dep.) at 116-18)  Rivera claims that only then

was he placed in handcuffs – along with leg irons and a waist restraint.  (Pltf. 56.1 App., Ex. 3

(Pltf. 2011 Dep.) at 53)  Once Rivera was restrained, Officer Madan conducted a pat-down

search.  (Madan Dep. at 97-98)  No contraband was discovered.  (Id. at 98)

Officers Madan, Cheeley, and an unidentified male parole officer then escorted

Plaintiff into a rear "holding" room.  (Def. R. 56.1 Stmt. ¶ 11)  Defendant Jarvis Jenkins,

Cheeley's supervisor, ordered Officer Madan to perform a visual inspection of Rivera's rectum.

(Id. ¶ 14)  According to Rivera, the inspection occurred at about 3:30 p.m. – more than three

hours after Plaintiff had arrived at Bronx IV.  (Pltf. Opp. Br. 5 (citing Pltf. R. 56.1 App., Ex. 6 at

Parole 14 (May 8, 2009 Memo from Officer Peart)))

## II.    THE BODY CAVITY SEARCH

The body cavity search was conducted by Defendants Madan, Winston Peart, and

Andre McKoy.  (Def. R. 56.1 Stmt. ¶ 17)  Rivera claims that after he was shackled in leg irons,

handcuffs, and waist restraints, these defendants left him in a back room and returned a short

time later with their "short sleeves rolled up, their watches off" and "surgical gloves on."  (Pltf.

2011 Dep. at 53-54, 64)  As Officer Madan brought Rivera to the room where the search would

be conducted, Rivera was "cursing, screaming, and being uncooperative."  (Def. R. 56.1. Stmt. ¶

25).  Officer Madan asked for other officers for assistance in bringing Rivera to the search room.

(Def. R. 56.1 App., Ex. J (McKoy Dep.) at 57).  Officer McCoy grabbed one of Rivera's arms

and Officer Peart grabbed the other.  (Id.)  The officers then brought Rivera to the search room.

(Def. R. 56.1 Stmt. ¶ 25)

At the search room, Officer Madan "grabbed [Rivera] by [his] neck, forced [him]

to the floor, put [his] face down on the floor, [and] put his knee on [his] neck."  (Pltf. 2011 Dep.

at 67)  Officer Madan put "all [his] weight" on Rivera while Officer McKoy grabbed Rivera's

neck and arm and forced him to the floor.  (Id. at 68-69, 75)  While Rivera was on the floor,

Officers McKoy and Peart grabbed his legs and pulled down his pants and underwear.  (Id. at 69;

Pltf. R. 56.1 App., Ex. 11 (Pltf. 2012 Dep.) at 24; Madan Dep. at 101, 105)

Rivera claims that one of these officers "put their fingers on [his] rectum on the

outer side[,] spread it open" and "looked in [his] anal cavity."  (Pltf. 2011 Dep. at 67, 71; Madan

Dep. 101, 105)  No one inserted anything into Rivera's rectum; his genital area was not touched;

and "nobody hit [him]" during the search.  (Def. R. 56.1 Stmt. ¶ 19; Pltf. 2011 Dep. at 71-76)

Defendants Jenkins, Cheeley, Dennis Kilcoyne, and Margaret Roberson stood at the doorway

and observed the search being performed, but did not intervene.  (Pltf. 2011 Dep. at 73, Pltf. R.

56.1 App., Ex. 9 (Kilcoyne Dep.) at 49, 50; Id., Ex. 12 (Roberson Dep.) at 54)  No contraband

was recovered from Rivera during the search.  (Def. R. 56.1 Stmt. ¶ 19)

## III.   THE ALLEGED ASSAULT AT BELLEVUE HOSPITAL

After the body cavity search, Rivera was returned to the holding room.  (Def. R.

56.1 Stmt. ¶ 28)  He was feeling "homicidal and suicidal" and asked to be taken to Bellevue

Hospital ("Bellevue") for psychiatric assistance and medication.  (Id.; Pltf. R. 56.1 Stmt. ¶ 28)

Officers Madan, Kilcoyne, and Roberson drove Rivera to Bellevue, where they escorted him to

Bellevue's psychiatric emergency unit.  (Def. R. 56.1 Stmt. ¶ 29)  While waiting to speak to a

psychiatrist, Rivera fell asleep.  (Pltf. 2012 Dep. at 42)  A psychiatrist eventually appeared, but

Rivera did not respond to the doctor's questions because he was "groggy" and "coming in and

out" of consciousness.  (Id. at 44; Pltf. 2011 Dep. at 86)  He was nevertheless given psychiatric

clearance by the doctor.  (Def. R. 56.1 Stmt. ¶ 30)

While "still groggy," Defendants Madan, Kilcoyne and Roberson "shook [him] wide awake." (Pltf. 2012 Dep. at 47)  Rivera then requested to see the doctor, and when these defendants refused, Rivera began "screaming for the psychiatrist" while "resisting" and "pulling away" from Officers Kilcoyne and Madan as they escorted him out of the examining area. (Def. R. 56.1 Stmt. ¶ 30)  Rivera alleges that – while he was resisting the officers – Officer Madan pushed him violently against the wall and then picked him up and slammed his head to the floor. (Pltf. R. 56.1 Stmt. ¶ 30)  Madan and Kilcoyne contend that after Rivera refused to comply with repeated orders to stop resisting them, they placed Rivera against the wall to prevent him from moving, and eventually brought him to the floor when he continued to resist. (Def. R. 56.1 Stmt. ¶ 33) It is undisputed that, as a result of this struggle, Rivera suffered a scalp abrasion and his head began bleeding. (Id. ¶ 34; Pltf. R. 56.1 Stmt. ¶ 34)  Rivera's head was treated at Bellevue, and he was then taken to Rikers Island. (Def. R. 56.1 Stmt. ¶ 35; Pltf. 2012 Dep. at 55)

## IV.   PROCEDURAL HISTORY

Plaintiff, proceeding pro se, filed the Complaint on May 19, 2010. (Dkt. No. 2) On August 11, 2011, Defendants moved for partial summary judgment. (Dkt. No. 18)  On September 29, 2011, this Court granted Plaintiff's application for the appointment of pro bono counsel. (Dkt. No. 24)  Plaintiff's attorneys filed their notices of appearances on October 26, 2011. (Dkt. Nos. 25-26)  Plaintiff filed an Amended Complaint on December 2, 2011. (Dkt. No. 30)  Defendants thereafter withdrew their motion for partial summary judgment. (Dkt. No. 32) Defendants filed their Answer on January 23, 2012. (Dkt. No. 37)  Defendants' current motion for summary judgment was filed on September 14, 2012. (Dkt. No. 49)

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and one party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

A court deciding a summary judgment motion must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.    PLAINTIFF'S FOURTH AMENDMENT CLAIMS

### A.    The Body Cavity Search

Plaintiff alleges that on January 30, 2009, he was subjected to an unjustified body cavity search at Bronx IV in violation of the Fourth Amendment.  Defendants argue that this Court should hold as a matter of law that their search of Plaintiff was not more intrusive than necessary to determine whether Plaintiff possessed contraband, and therefore did not violate Plaintiff's Fourth Amendment rights.

1.    **Applicable Law**

The Fourth Amendment restrains the government from conducting "unreasonable searches."  U.S. Const. amend. IV.  Whether a search is reasonable under the Fourth Amendment "'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  United States v. Massey, 461 F.3d 177, 178 (2d Cir. 2006) (quoting Samson v. California, 547 U.S. 843, 848 (2006)).  "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  Bell v. Wolfish, 441 U.S. 520, 559 (1979).

Courts must "examin[e] the totality of the circumstances" surrounding the search, which includes the Plaintiff's status as a parolee.  United States v. Knights, 534 U.S. 112, 118 (2001).  "Although no longer physically in prison, the parolee is constructively still a prisoner." Baker v. Welch, No. 03 Civ. 2267 (JSR)(AJP), 2003 WL 22901051, at *11 (S.D.N.Y. Dec. 10, 2003).  Thus, a parolee has a lower expectation of privacy for Fourth Amendment purposes than does an ordinary citizen.  See Samson, 547 U.S. at 852 (noting that "parolees . . . have severely diminished expectations of privacy by virtue of their status alone"); United States v. Grimes, 225 F.3d 254, 258 (2d Cir. 2000) ("[W]e hold that, like probation, parole justifies some departure from traditional Fourth Amendment standards.").  Moreover, "[a] parolee's diminished expectation of privacy would necessarily be further diminished while he is in his parole officer's office."  United States v. Thomas, 729 F.2d 120, 123-24 (2d Cir. 1984).

The Fourth Amendment still provides some degree of protection for parolees, however.  See United States v. Newton, 369 F.3d 659, 665 (2d Cir. 2004) ("Although probationers and parolees are subject to 'a degree of impingement upon privacy that would not

be constitutional if applied to the public at large,' the law requires that such greater intrusions occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement.'" (quoting <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873, 875 (1987)) While "parolees possess diminished Fourth Amendment protections, and the precise scope of the protections they retain is uncertain," a parolee still enjoys a level of Fourth Amendment protection that is greater than the "the <u>de minimis</u> Fourth Amendment protection that incarcerated inmates retain."  <u>Hope v. Goines</u>, No. 00 CV 3476 (JG), 2002 WL 2003201, at *3 (E.D.N.Y. Aug. 8, 2002); <u>see also</u> <u>Diaz v. Ward</u>, 437 F. Supp. 678, 682 (S.D.N.Y. 1977) (noting that "the law is settled in this Circuit that a parolee's Fourth Amendment rights are reduced, but not eliminated").

Under New York law, the issue of whether a warrantless parole search is "unreasonable and thus prohibited by constitutional proscription . . . turn[s] on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." <u>People v. Huntley</u>, 43 N.Y.2d 175, 181 (1977).  The Second Circuit has held that "the New York rule [articulated in <u>Huntley</u>] is coextensive with the requirements of the Fourth Amendment":

> A rule indicating that a search of a parolee is permissible so long as it is reasonably related to the parole officer's duties is identical to a rule that parole officers may conduct searches so long as they comport with the Fourth Amendment.  This is because the doctrine of "special needs" permits those searches that are reasonably related to the special needs animated by management of a parole system.

<u>Grimes</u>, 225 F.3d at 259 n.4.  Accordingly, where a parolee challenges a parole officer's search as violative of the Fourth Amendment, "the central issue . . . is 'whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.'"  <u>United States v. Barner</u>, 666 F.3d 79, 85 (2d Cir. 2012) (quoting <u>Huntley</u>, 43 N.Y.2d at

181)).  In this regard, the Second Circuit has repeatedly acknowledged that when parole officers have received information that a parolee may have violated parole conditions, the "[p]arole officers have a duty 'to investigate. . . .'"  Id. (quoting United States v. Reyes, 283 F.3d 446, 459 (2d Cir. 2002)); see also Newton, 369 F.3d at 666 (holding that a search for firearms in a parolee's residence satisfied Huntley because "the obligation to detect and prevent parole violations so as to protect the public from the commission of further crimes is part of a parole officer's duty").

**B.**   **Analysis**

**1.**   **The Body Cavity Search Was Reasonable**

A body cavity search is "by its very nature a 'highly intrusive invasion' [of privacy]."  Rivera v. United States, 928 F.2d 592, 607 (2d Cir. 1991) (quoting M.M. v. Anker, 607 F.2d 588, 589 (2d Cir. 1979)); see also Hartline v. Gallo, 546 F.3d 95, 102 (2d Cir. 2008) (noting "the uniquely intrusive nature of strip searches . . . in [a] society that takes privacy and bodily integrity seriously").  However, the undisputed facts indicate that Defendants were justified in conducting the search, especially in light of Rivera's "severely diminished expectation[] of privacy" as a parolee.  Samson, 547 U.S. at 852.

First, Rivera consented to his person being searched by his parole officer as one of his parole conditions.  (Def. R. 56.1 Stmt. ¶ 1; Def. R. 56.1. App., Ex. A (Rivera's conditions of release), at Parole 1 6/1/11, Condition 4 (Rivera agreed to "permit the search and inspection of my person" as a condition of parole)); see also United States v. Lifshitz, 369 F.3d 173, 180 (2d Cir. 2004) ("[T]he imposition of a search condition as part of probation creates a diminished expectation of privacy.").  In addition, it is undisputed that Officer Madan had received specific information from Rivera's girlfriend that he had left her apartment on his way to Bronx IV

carrying small bags of crack cocaine.  (Def. R. 56.1 Stmt. ¶ 4; Pltf. R. 56.1 App., Ex. 5

(Confidential 17))  It is also undisputed that Rivera's girlfriend had told Officer Madan that

Rivera had told her that if his parole was revoked, he was either going to swallow the drugs or

insert them in his rectum in order to smuggle them into Rikers Island.  (Id.)  She further reported

to Officer Madan that Rivera was planning on swallowing a razor or inserting it in his rectum.

(Def. R. 56.1 Stmt. ¶ 4; Madan Dep. at 83)  Finally, it is undisputed that Rivera was "squirming"

in his seat while seated in Officer Madan's office.  (Def. R. 56.1 Stmt. ¶ 8)

                Construing these facts in the light most favorable to Plaintiff, Defendants' search

of Rivera's body cavity was "'rationally and reasonably related to the performance of the parole

officer's duty.'"  Barner, 666 F.3d at 85 (quoting Huntley, 43 N.Y.2d at 181)).  As parole

officers, Defendants "have a duty to 'investigate whether a parolee is violating the conditions of

his parole.'"  Id. (quoting Reyes, 283 F.3d at 459).  One of those conditions is a prohibition

against possessing controlled substances.  (Def. R. 56.1 App., Ex. A (Rivera's conditions of

release), at Parole 1 6/1/11, Condition 11 (prohibiting Rivera from "possessing any controlled

substance"))

                Here, Defendants had been told by Rivera's girlfriend that he might have crack

cocaine and a razor blade secreted in his rectum.  This report was entirely plausible, both because

Rivera had admitted to Officer Madan that he was using drugs, and because Rivera had good

reason to fear that his parole would be revoked and that he would be returned to Rikers Island.[4]

"Once [Officer Madan] had this information, it was clearly reasonable for [him] to investigate

the accusations further."  Barner, 666 F.3d at 85.  While Defendants' body cavity search of

---

[4]  Rivera had failed to appear for his regularly scheduled report the previous day, a clear parole
violation.  (Def. R. 56.1 App., Ex. A (Rivera's conditions of release)))  He also had used heroin
the previous day, knew that he would be subjected to a drug test, and knew that he would test
positive for illegal drug use – another clear violation of his parole conditions.  Id.

Rivera was "intrusive," <u>Hartline</u>, 546 F.3d at 102, "[the] search satisfied the reasonable relationship requirement of <u>Huntley</u> because it was performed in direct response to information that [Defendants] obtained and that [they] had a duty to investigate further. . . ." <u>Barner</u>, 666 F.3d at 85.

 Rivera argues, however, that the search was not justified because Officer Madan had reason to doubt the girlfriend's credibility.  (Pltf. Opp. Br. at 12)  Plaintiff notes that Officer Madan believed that the girlfriend "was a bad influence on Plaintiff" and knew that she had a motive for wanting him sent back to jail – she "didn't want [Rivera] back in the house."[5] (Madan Dep. at 83)  In sum, Rivera argues that the information the girlfriend provided did not "carr[y] enough indicia of reliability to justify" the search.  (Pltf. Opp. Br. at 12 (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 147 (1972)))

 To search a parolee, a parole officer needs only "reasonable suspicion (or potentially a lesser standard." <u>See</u> <u>Lifshitz</u>, 369 F.3d at 179.[6]  "'[R]easonable suspicion' constitutes a less stringent standard than 'probable cause,'" <u>id. at 188</u>, and "falls considerably short of satisfying a preponderance of the evidence standard."  <u>United States v. Arvizu</u>, 534 U.S. 266, 273-74 (2002).  It merely requires "more than an 'inchoate and unparticularized suspicion or hunch.'"  <u>United States v. Elmore</u>, 482 F.3d 172, 178 (2d Cir. 2007) (quoting <u>Alabama v. White</u>, 496 U.S 325, 329-30 (1990)).  Notwithstanding the credibility issues cited by Rivera, his

---

[5]  Rivera does not explain why it is reasonable to assume that the girlfriend may have believed that falsely accusing Rivera of having crack cocaine in his rectum would likely lead to his incarceration.

[6]  While <u>Lifshitz</u> involved the search of a probationer instead of a parolee, "'[p]arole is meted out in addition to, not in lieu of, incarceration[,] . . . ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.'"  <u>Grimes</u>, 225 F.3d at 258 (quoting <u>United States v. Cardona</u>, 903 F.2d 60, 63 (1st Cir. 1990).

girlfriend's tip was sufficient to establish reasonable suspicion to search Rivera given all the circumstances discussed above.

### 2.        The Body Cavity Search Was Not More Intrusive Than Necessary

The physical contact that Defendants had with Rivera in connection with performing the body cavity search was reasonable in light of the information provided to them. Officer Madan had been told that Rivera intended to insert crack cocaine, and possibly a razor, in his rectum.  In this context and in light of the other circumstances discussed above – and given the undisputed evidence that Rivera was "belligerent," was "cursing" and "screaming" and refusing to cooperate with the officers' efforts to conduct the search (Def. R. 56.1 Stmt. ¶ 25; (Pltf. Opp. Br. at 5 (citing Cheeley Dep. at 116-118)) – it was not unreasonable for officers to touch Rivera's buttocks and spread them open in order to conduct a visual inspection.  (See Kilcoyne Dep. at 51 (stating that "someone grabbed [Rivera's] butt cheeks and spread them open"; Pltf. R. 56.1 App., Ex. 6 (May 8, 2009 Memo from Officer Peart) ("[Rivera's] cheeks spread by the officer wearing latex gloves")).

Rivera does not allege that the search amounted to excessive force under the Fourth Amendment, nor could he credibly do so.  In analyzing an officer's use of force under the Fourth Amendment, courts consider whether "the amount of force used was objectively reasonable at the time" by balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake.  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004).  Here, there is also no allegation that Rivera suffered any physical injuries or pain as a result of the body cavity search. It is likewise undisputed that was not struck by the officers, and that the search did not involve the insertion of anything into his body or the touching of his genitals.  (Def. R. 56.1 Stmt. ¶ 19;

Pltf. 2011 Dep. at 71, 74-75)  This is not a case in which "a reasonable jury could . . . find that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances. . . ." Amnesty Am., 361 F.3d at 124.

Given all the circumstances – including the nature of the information provided to the parole officers, Rivera's diminished expectation of privacy as a parolee, Rivera's resistance to the search, and the manner in which the search was conducted – this Court concludes that the parole officers' body cavity search did not violate the Fourth Amendment and that Defendants are entitled to summary judgment on this claim.[7]

### C. The Bellevue Hospital Incident

Plaintiff also alleges that Defendants Madan, Roberson, and Kilcoyne subjected him to excessive force while at Bellevue in violation of the Fourth Amendment.  (Am. Cmplt., Second Claim for Relief)  Defendants argue that this Court should hold as a matter of law that the level of force they used was appropriate under the circumstances, and that any injuries Plaintiff suffered were de minimis.  (Def. Br. 15)

### 1. Applicable Law

The Fourth Amendment applies to an excessive force claim brought by a parolee in connection with "some new offense or violation [parole officers] believed had been

---

[7]  Relying on an email, Rivera argues that the search was improper under internal parole guidelines.  (Pltf. Opp. Br. 16; Pltf. R. 56.1 App., Ex. 13 (April 10, 2012 email) at Confidential 2)  Neither side has submitted any formal policy issued by the Division of Parole or DOCCS.  In any event, the issue here is not whether Defendants violated a DOCCS policy, but rather whether conducting the body cavity search violated Rivera's constitutional rights.  A violation of internal policies and procedures does not by itself give rise to liability under Section 1983.  See Young v. County of Fulton, 160 F.3d 899, 902 (2d Cir. 1998) ("Without more, the fact that defendants violated New York procedural requirements does not support liability under § 1983."); Robinson v. Via, 821 F.2d 913, 922 (2d Cir. 1987) ("[A] violation of state law neither gives [a plaintiff ] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); Madera v. Goord, 103 F. Supp. 2d 536, 541 (N.D.N.Y. 2000) ("[T]he violation of state regulations alone does not rise to the level of a constitutional violation.").

committed." Turner v. White, 443 F. Supp. 2d 288, 294 (E.D.N.Y. 2005); Towsley v. Frank, No. 09 Civ. 23, 2010 WL 5394837, at *5-6 (D. Vt. Dec. 28, 2010) (analyzing excessive force claim under Fourth Amendment, because "[Plaintiff's] arrest was justified not by his prior conviction or his status as a parolee, but by the separate violation of his parole conditions").

   In order to establish that an officer used excessive force in violation of the Fourth Amendment, a plaintiff must demonstrate, "in light of the totality of the circumstances faced by the arresting officer, [that] the amount of force used was objectively [un]reasonable at the time." Amnesty Am., 361 F.3d at 123 (citing Graham, 490 U.S. at 397). See also Batson-Kirk v. City of New York, No. 07-CV-1950, 2009 WL 1505707 (KAM)(JMA), at *11 (E.D.N.Y. May 28, 2009); Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002).

   Because "[t]he Fourth Amendment test of reasonableness 'is one of objective reasonableness,'" Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005) (quoting Graham, 490 U.S. at 399), the inquiry is necessarily "fact- specific" and requires a plaintiff to "establish that the government interests at stake [are] outweighed by 'the nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests.'" Amnesty Am., 361 F.3d at 123 (quoting Graham, 490 U.S.at 396). In balancing these interests, a court must consider, inter alia, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (quoting Graham, 490 U.S. at 396); see also Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006). A court must consider the evidence "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Tracey v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (quoting Jones, 465 F.3d at 61). Moreover, courts must "make 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances

that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. '" Id. (quoting Graham, 490 U.S. at 397).  Nonetheless, the Second Circuit has cautioned that, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am., 361 F.3d at 123 (citing O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)).

2.   **Analysis**

There are material issues of fact concerning the extent to which Plaintiff resisted efforts by Officers Kilcoyne and Madan to escort him from Bellevue to Rikers Island, the degree of force that was used by the officers, and whether Plaintiff posed a threat to anyone's safety.

While it is undisputed that Plaintiff was resisting efforts to lead him out of Bellevue (Def. R. 56.1 Stmt. ¶ 30), he was unarmed and was in handcuffs, leg restraints, and a waist restraint at the time.  (Madan Dep. 136-137)  Plaintiff argues that his resistance was therefore minimal and that, in any event, the officers' response was disproportionate to his level of resistance.  (Pltf. Opp. Br. 21-22)

The degree of force that was used is very much in dispute.  Defendants contend that Plaintiff was merely "placed against a wall to prevent him from moving and was brought to the floor when he continued to resist."  (Def. Br. at 16 (citing Madan Dep. at 136, 140))  Plaintiff asserts that Officer Madan shoved him violently into the wall and then picked him up and slammed his head to the floor, causing "the left side of [Rivera's] scalp [to] bust[] open and [to] start[] bleeding."  (Pltf. R. 56.1 Stmt. ¶ 30; Pltf. 2011 Dep. at 89)  Given the disputed issues of fact about the level of resistance and amount of force used, Defendants have not demonstrated that the force they used is objectively reasonable as a matter of law.

Moreover, while a plaintiff who suffers only de minimis injuries may not be able to survive summary judgment on an excessive force claim, the alleged injuries here are sufficient to trigger potential liability for excessive force.  It is undisputed that Rivera suffered a scalp abrasion that caused his head to bleed, and that required emergency medical treatment.  (Def. R. 56.1 Stmt.¶ 34; Pltf. R. 56.1 Stmt. ¶ 34; see also Pltf. R. 56.1 App., Ex. 18 (Bellevue Hospital Record))  Rivera also claims that he experienced pain for months after the incident.  (See Pltf. R. 56.1 App., Ex. 19 (March 10, 2009 Consultation Request) (noting that on March 10, 2009, Rivera was still complaining about a "headache post trauma 1-13-09"))  These injuries are sufficient to support an excessive force claim.  See, e.g., Robison, 821 F.2d at 923-24 (summary judgment denied where officer twisted plaintiff's arm and she suffered a bruise of unspecified extent and degree; no evidence that bruise persisted or required medical treatment); Davis v. City of New York, No. 04-CV-3299 (JFB)(RLM), 2007 WL 755190, at *12-13 (E.D.N.Y. Feb. 15, 2007) (denying summary judgment where plaintiff alleged redness and soreness in shoulder after officer kicked her); see also Blair v. City of New York, No. 03 CV 1485(SLT)(CLP), 2009 WL 959547, at *10-11 (E.D.N.Y. Mar. 31, 2009) (excessive force plaintiff need not show continuing or long-term injury or medical treatment); Sforza v. City of N.Y., No. 07 Civ. 6122(DLC), 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("[P]laintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient.").

Accordingly, Defendants Madan, Roberson and Kilcoyne are not entitled to summary judgment on the Amended Complaint's Second Claim for Relief.

III.   __PERSONAL INVOLVEMENT__

Officer Roberson argues that she is entitled to summary judgment on the Amended Complaint's Second Claim for Relief because there is insufficient evidence of her personal involvement in the Bellevue incident.  (Def. Br. at 19)  Plaintiff does not respond to this argument in his opposition brief.

"In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  De Michele v. City of New York, 09 Civ. 9334 (PGG), 2012 WL 4354763, at *16 (S.D.N.Y. Sept. 24, 2012) (citations omitted).  "To survive a motion for summary judgment, there must be some evidence of the personal involvement of each defendant in the alleged constitutional deprivation."  Ricks v. O'Hanlon, No. 07 Civ. 9849(WHP), 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010) (citing Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).  "'Personal involvement' is a question of fact, governed by the general rule that summary judgment may be granted only if no issues of material fact exist."  Shankle v. Andreone, No. 06-CV-487 (NG)(LB), 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009) (citing Williams, 781 F.2d at 323).

Here, it is undisputed that Officer Roberson did not use force against Plaintiff during the Bellevue incident, but there is evidence that she was present when Officer Madan allegedly slammed Plaintiff's head into the floor, and did not intervene.  (Pltf. 2012 Dep. at 53)  Construing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Roberson violated her duty to intervene to prevent other officers from violating Rivera's constitutional rights.  See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to

protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

Plaintiff has demonstrated sufficient personal involvement on the part of Officer Roberson to survive summary judgment.[8]

## IV.   QUALIFIED IMMUNITY

Defendants argue that even if they violated Plaintiff's rights, they are entitled to qualified immunity.  (Def. Br. 19-25)  As a general matter, parole officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003) (citation omitted).  It is well established that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  Saucier v. Katz, 533 U.S. 194, 201-02 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2001) (citing Graham v. Connor, 490 U.S. 386 (1989)).  However, identifying the generalized constitutional protection is not enough; the law must be "clearly established in a more particularized sense," Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001) (citing Anderson v. Creighton, 488 U.S. 635, 640 (1986)), that is, "in . . . the specific context of the case."  Saucier, 533 U.S. at 201.  The Supreme Court has made clear that officers who have used excessive force may be entitled – under the qualified immunity doctrine – to an extra layer of protection "from the sometimes hazy border between excessive and acceptable force."  Id. at 206.  The relevant inquiry "is whether it would

---

[8]  Defendants' reliance on Minter v. County of Westchester, No. 08 Civ. 7726 (WHP), 2011 WL 856269 (S.D.N.Y. Jan. 20, 2011) is misplaced.  In Minter, the court dismissed claims against certain members of a SWAT team for lack of personal involvement.  These defendants were stationed outside Plaintiff's residence but were not present for his arrest inside the home.  Id. at *7.  Here, by contrast, Rivera has alleged that Officer Roberson observed other officers allegedly violating Plaintiff's constitutional rights but failed to intervene.

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202; see Loria v. Gorman, 306 F.3d 1271, 1286 (2d Cir. 2002) ("Said differently, . . . we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions.").

    Here, there are material issues of fact that preclude summary judgment on Defendants' qualified immunity defense as it pertains to the Bellevue incident.  If, as Rivera claims, he was subjected to an unprovoked violent assault at Bellevue, the officers could not have reasonably believed that their actions were lawful.  Resolution of Rivera's excessive force claim and Defendants' qualified immunity defense requires credibility determinations that are the province of a jury.  See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994); see also Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008) ("[If] a reasonable jury might determine that Defendants were acting in a fashion that clearly violated [Plaintiff's] Fourth Amendment rights[,] . . . Defendants are . . .  not entitled to summary judgment on the issue of qualified immunity.").

## CONCLUSION

    For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to the Amended Complaint's First Claim for Relief but DENIED as to the Second Claim for Relief.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 49).

    The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order.  The joint pre-trial order will be filed on October 14, 2013. Motions in limine, voir dire requests, and requests to charge are due on October 14, 2013. Responsive papers, if any, are due on October 23, 2013.  Trial will commence on November 11, 2013, at 9:00 a.m., in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York.

Dated: New York, New York
     September 11, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge